## TERRE HAUTE & I. R. CO. v. HARRISON et al.

(Circuit Court of Appeals, Seventh Circuit. March 1, 1898.)

No. 461.

1. PRIORITY OF RAILROAD MORTGAGE — OPERATING AGREEMENT — EQUITABLE LIEN FOR BETTERMENTS.

A railroad company in possession of a branch line under an operating agreement wherein it agreed to take up, and hold as security, a mortgage thereon, cannot acquire an equitable lien, prior to the mortgage, on any part of the mortgaged property, for betterments thereto, or for any balance due it on an accounting with the mortgagor.

2. SAME — INVALIDITY OF OPERATING AGREEMENT — EQUITABLE LIEN FOR BETTERMENTS.

Where a branch line, held by a railroad company under an invalid operating agreement, was, with the consent of such company, mortgaged by the owner to procure money to build an extension and pay for additional equipments, all of which were delivered to, and for years used by, said company under said agreement, such company was not entitled to an equitable lien, prior to such mortgage, for betterments added to the property, either prior or subsequent to the date of the mortgage.

Appeal from the Circuit Court of the United States for the District of Indiana.

Appellee Benjamin Harrison, trustee, on December 30, 1896, exhibited his bill in the circuit court of the United States for the district of Indiana against his co-appellee, the Terre Haute & Logansport Railroad Company, and this appellant. He sought to foreclose a deed of trust wherein his co-appellee had alienated to him on January 1, 1883, certain railroad property to secure the payment of bonds of that company aggregating $1,000,000, with interest to be paid semiannually at the rate of 6 per cent. per annum. The bill was taken as confessed against the Terre Haute & Logansport Railroad Company. Appellant answered, and filed its cross bill. Exceptions were sustained to certain portions of the answer, the cross bill was dismissed for want of equity on demurrer, a final decree of foreclosure went in favor of appellee Harrison, and appellant brings the record here on appeal.

On November 1, 1879, the Terre Haute & Logansport Railroad Company owned a line of railroad from Rockville to Logansport, in Indiana. It also held a road from Rockville south to Terre Haute, under a long lease from the owner, the Evansville & Terre Haute Railroad Company. This property, together with all other property which the appellee railway company then had or might thereafter acquire for use in connection with said railroad, was on that day alienated to Benjamin Harrison, trustee, to secure coupon bonds aggregating $500,000, payable January 1, 1910, with interest to be paid semiannually at the rate of 6 per cent. per annum. Appellant then owned and operated a line of railway from Indianapolis westward through Terre Haute to the Illinois state line. Under date of November 22, 1879, the Terre Haute & Logansport Railroad Company, as party of the first part, and appellant, as party of the second part, made the following agreement:

"Operating Contract between Terre Haute and Logansport Railroad Company and Terre Haute and Indianapolis Railroad Company, under date of November 22nd, 1879, for Ninety-Nine Years from December 1st, 1879.

"This indenture, made this twenty-second day of November, A. D. 1879, by and between the Terre Haute and Logansport Railroad Company, a corporation of Indiana, party of the first part, and the Terre Haute and Indianapolis Railroad Company, likewise a corporation of Indiana, party of the second part, witnesseth: Whereas, the party of the first part is the owner of and is operating a line of railroad extending from Rockville, Parke county, Indiana, to Logansport, Cass county, Indiana, and, under a contract with the Evansville and Terre Haute Railroad Company, is in possession of and operating a rail-

88 F.—58

road extending from said town of Rockville to Terre Haute, Indiana, the said two lines of railroad being operated as one continuous line from Logansport to Terre Haute, Indiana, at which latter place it connects with the line of railroad owned and operated by the party of the second part; and whereas, said line of railroad of the party of the first part is in bad repair, and poorly equipped with rolling stock, and is wholly lacking in machine or repair shops, terminal and depot facilities, and the party of the first part has not the means in hand to make the necessary repairs, and enlarge its equipment of rolling stock, or build machine shops or depots, or acquire terminal facilities; and whereas, if said railroad of the party of the first part be operated in conjunction with the railroad of the party of the second part the present and immediate necessities of said railroad of the party of the first part can be relieved, and the said line of railroad operated with economy, and its business developed, to the great and mutual advantage of both parties hereto: Now, therefore, it is mutually agreed by and between the parties hereto:

"Article First. That in consideration of the covenants and agreements to be performed by the party of the second part, as hereinafter specified, the party of the first part hath agreed and doth hereby agree to put said party of the second part, its agents, servants, and employés, into possession of the line of railroad owned and operated by the party of the first part, as aforesaid, extending from Terre Haute, in the county of Vigo, through the counties of Vigo, Parke, Montgomery, Boone, Clinton, Carroll, and Cass, to Logansport, in said county of Cass, all in the state of Indiana, a distance of about 116 miles, together with all property, real and personal, and all the rolling stock, equipment, and franchises, to said line of railroad appertaining or belonging.

"Article Second. The party of the second part, in consideration of the premises, agrees to take charge of said line of railroad and property, and operate the same for a period of ninety-nine (99) years from the first day of December, A. D. one thousand eight hundred and seventy-nine (1879); and after retaining seventy-five (75) per cent. of the gross receipts from all traffic moved over said line, or business done thereon, for its own separate use and exclusive benefit, the party of the second part agrees to appropriate the remaining twenty-five (25) per cent. as follows, to wit: First. To the payment of taxes assessed against the property held and operated under this contract. Second. To the payment of the interest as it falls due on the first mortgage bonds of said party of the second part; being an issue of bonds to the amount of five hundred thousand dollars, bearing interest at the rate of six (6) per centum per annum, payable on the first day of January, A. D. 1910, and secured by a deed of trust conveying to Benjamin Harrison, of Indianapolis, Indiana, as trustee, the line of railroad and property of the party of the first part, hereinbefore described. Third. To the payment of rental accruing to the Evansville and Terre Haute Railroad Company for the use of its said line of railroad, extending from Terre Haute, Indiana, to Rockville, Indiana. Fourth. The surplus, if any, to be paid annually to said party of the first part.

"Article Third. The party of the second part further agrees that if the said 25 per cent. shall not be sufficient to pay the taxes, interest, and rental aforesaid, and proper cost of maintaining the corporate organization of the party of the first part, then the deficit shall be advanced by the party of the second part at such time or times as may be necessary to make prompt payment of the said interest, taxes, and rental and costs as the same become due; and the amount so advanced shall be charged to and repaid by said party of the first part to the party of the second part.

"Article Fourth. The party of the second part further agrees that it will, at its own expense, during the continuance of this agreement, keep, preserve, and maintain the said line of railroad of the party of the first part in good working condition and repair, and will in like manner maintain and preserve in good repair all the rolling stock, buildings, fixtures, and machinery, and all other property, belonging and appertaining to said railroad, and taken by the party of the second part by virtue hereof, whether the same be received at the time of the taking effect of this agreement, or be hereafter acquired, pursuant to the terms hereof.

"Article Fifth. Inasmuch as the line of railroad to be operated under this contract is comparatively incomplete, as to rights of way, rolling stock, grades, embankments, cuts, trestles, bridges, fences, depots, stations, sidings, and terminal facilities, and other items of construction, and it is anticipated by both parties hereto that it will become necessary or advisable to make changes and additions that will be, in their nature, permanent improvements to said line, therefore it is understood and agreed that said party of the second part may, in its discretion, make such changes, additions, improvements, and replacements to and along said line of railroad, and may purchase and acquire such rights of way, rolling stock, and equipment, as to the party of the second part may seem advisable or necessary for the proper and successful operation of said road; and the party of the first part covenants and agrees to repay the party of the second part all outlays made or expenses incurred in making such changes, additions, improvements, purchases, and replacements, including any additional real estate or interests therein procured for the use of said line of railroad.

"Article Sixth. The party of the second part agrees to pay and satisfy all legal and valid claims for damages to persons or property occasioned by the operation of the said line of railroad by the party of the second part, and to save and keep harmless the party of the first part from all costs or expenses on account thereof.

"Article Seventh. And it is expressly understood that the party of the first part will not in any way further incumber its said railroad property, and will at the maturity of its bonds hereinbefore mentioned, amounting to five hundred thousand dollars, protect the party of the second part in its quiet enjoyment of the said line of railroad and property taken by the party of the second part under this agreement, as against a foreclosure and sale of said railroad and property to pay said principal, and if the party of the first part has not the means to pay said principal, and is unable to procure the same, then the party of the second part agrees to advance the means to take up the said bonds at their maturity; but it is expressly agreed that, in the event said bonds are so taken by the party of the second part, they shall not be deemed paid, but shall remain valid and subsisting securities in the hands of the party of the second part for the repayment to it by the party of the first part of the advances made to take up said bonds as aforesaid: provided, always, that the party of the first part may, if it so desires, at the maturity of said bonds renew them for a further period of 30 years at a rate of interest not exceeding six (6) per centum per annum.

"Article Eighth. It is agreed that possession of said line of railroad, franchises, and property is to be given under this indenture on the first day of December, A. D. 1879. And the party of the first part covenants and agrees to and with the party of the second part that the said party of the second part shall have the quiet and uninterrupted use and exclusive enjoyment of said line of railroad, property, and franchises for the said term of ninety-nine years, and shall enjoy, peaceably and without interference, all the powers, rights, and privileges of the said Terre Haute and Logansport Railroad Company, so far as the same may be needful to maintain and operate said railroad in the manner aforesaid, including the right to impose and collect tolls and rates for transportation of freight and passengers, as fully and effectually as the said Terre Haute and Logansport Railroad Company could do if operating said line.

"Article Ninth. It is further agreed that if, at any time, it becomes necessary to pay any sum or sums of money to perfect the title of the party of the first part in and to the property taken by the party of the second part under this contract, or to protect the party of the second part in its possession and use thereof, and the party of the first part has not the means to pay or adjust the same, then the party of the second part will advance the necessary sum or sums.

"Article Tenth. The party of the second part shall have the right at any time to retain out of any moneys in its possession, due to the party of the first part under this agreement, any and all sums advanced by it to the party of the first part; and, if the party of the second part takes up the first mortgage bonds aforesaid of the party of the first part at maturity thereof, the party of the second part agrees that it will not enforce payment thereof

for the period of six (6) months from and after the date it pays the money for said bonds.

"In testimony whereof, the Terre Haute and Logansport Railroad Company and the Terre Haute and Indianapolis Railroad Company have caused these presents to be executed by their respective presidents, and their corporate seals to be hereunto affixed by their respective secretaries, the day and year first above written.

"Terre Haute and Logansport Railroad Company,
"[Seal.]                                    By W. R. McKeen, President.
"Attest:   Geo. E. Farrington, Secretary.
"Terre Haute and Indianapolis Railroad Company,
"[Seal.]                                    By W. R. McKeen, President.
"Attest:   Geo. E. Farrington, Secretary."

Afterwards, and under date of June 21, 1883, the Terre Haute & Logansport Railroad Company, as party of the first part, made with appellant, as party of the second part, a second agreement, in words following:

"Contract between the Terre Haute and Logansport Railroad Company and Terre Haute and Indianapolis Railroad Company for Operating the Terre Haute and Logansport Railroad Company's Extension, under Date of June 21st, 1883.

"This indenture, made this 21st day of June, A. D. 1883, by and between the Terre Haute and Logansport Railroad Company, a corporation of the state of Indiana, as party of the first part, and the Terre Haute and Indianapolis Railroad Company, also a corporation of the state of Indiana, as party of the second part, witnesseth: Whereas, since the execution of the operating contract of November 22d, A. D. 1879, between the parties hereto, the party of the first part has determined to make an extension of the Terre Haute and Logansport Railroad from the city of Logansport, Cass county, Indiana, through the counties of Cass, Fulton, Marshall, and St. Joseph, in the state of Indiana, to the city of South Bend, Indiana, and for the purpose of constructing such extension, and in order to raise money to pay for additional equipment and permanent improvements and betterments to the railroad now operated by the party of the second part under said contract of November 22d, A. D. 1879, the party of the first part has decided to issue its bonds to an amount not exceeding one million dollars, dated January 1st, A. D. 1883, due January 1st, A. D. 1913, and designated as 'The Terre Haute and Logansport Railroad Company's Extension Mortgage Six per Cent. Bonds'; and whereas, to secure the payment of said bonds the party of the first part, under date of January 1st, A. D. 1883, has conveyed by its trust deed or mortgage to Benjamin Harrison, of Indianapolis, the railroad property and appurtenances now owned by the party of the first part between Rockville and Logansport, and also the said proposed extension of the Terre Haute and Logansport Railroad from Logansport to South Bend, Indiana; and whereas, the parties hereto desire that the said extension, when completed, shall be operated by the party of the second part, and the boards of directors of the parties hereto have respectively authorized the making of an operating contract for said extension upon the terms and conditions hereinafter specified: Now, therefore, it is mutually agreed between the parties hereto as follows, to wit:

"Article First. In consideration of the covenants and agreements to be performed by the party of the second part, as hereinafter specified, the party of the first part has agreed, and does hereby agree, to put said party of the second part, its agents, servants, and employés, into possession of the said extension of the Terre Haute and Logansport Railroad between Logansport and South Bend, a distance of about sixty-seven miles, together with all the property, real, personal, and mixed, and the franchises acquired or to be acquired for the use of said extension.

"Article Second. The party of the second part hereby agrees to take possession, from time to time, of so much of said extension as may be ready for operation, and operate the same, and finally take possession of the whole of said extension, and to operate the same until the first day of December, 1978, in connection with the Terre Haute and Logansport Railroad, and as one continuous line between the cities of Terre Haute and South Bend afore-

said; and after retaining seventy-five per cent. of the gross receipts from all traffic moved on said continuous line, or business done thereon, for its own separate use and exclusive benefit, the party of the second part agrees to appropriate the remaining twenty-five per cent. as follows, to wit: First. To the payment of all taxes assessed against the property held and operated under the said contract of November 22d, A. D. 1879, and this contract. Second. To the payment of the interest as it falls due upon the following mortgage bonds of the party of the first part, to wit: Its first mortgage bonds, amounting to five hundred thousand dollars, payable January 1st, A. D. 1910, with interest at the rate of six per cent. per annum, payable semiannually on the first days of January and July, and its said extension mortgage bonds amounting to one million dollars, payable January 1st, A. D. 1913, with interest at six per cent. per annum, payable on the first days of January and July in each year: each issue of said bonds being secured by a mortgage or deed of trust to Benjamin Harrison, Esq., of Indianapolis. Third. To the payment of the rental, as it accrues, to the Evansville and Terre Haute Railroad Company for the use of its line of railroad between Terre Haute and Rockville. Fourth. The surplus, if any, to be paid annually to the party of the first part.

"Article Third. The party of the second part agrees that if the said twenty-five per cent. shall be at any time insufficient to pay the taxes, interest, and rental aforesaid, and the proper cost of maintaining the corporate organization of the party of the first part, then the deficit shall be advanced by the party of the second part at such time or times as may be necessary to make prompt payment of said interest, taxes, rental, and cost as the same become due, and the amount so advanced shall be charged to and repaid by said party of the first part to the party of the second part.

"Article Fourth. The party of the second part further agrees that it will operate said extension for the term aforesaid upon the same terms, as to the maintenance, repair, and preservation thereof, and payment of damages and costs resulting from the operation thereof, as are now required of it in its operation of the line of railroad between Terre Haute and Logansport under the said contract of November 22d, A. D. 1879: and the party of the first part agrees that the provisions of said contract under which the party of the second part is entitled to make changes, additions, improvements, and replacements to said line between Terre Haute and Logansport, and to perfect titles thereto and purchase additional equipment, etc., etc., and retain any moneys due the party of the first part, shall be, and they are hereby, extended and made applicable to said extension, the same as if said extension had been included in and covered by said contract of November 22d, 1879.

"Article Fifth. It is agreed that the party of the first part may renew from time to time, if it so desires, its said extension mortgage bonds, at a rate of interest not exceeding six per cent. per annum; and if the party of the first part be unable to pay the principal of said extension bonds, or of any renewals thereof, when they become due, then the party of the second part agrees that it will advance the money to take up said bonds or renewals, as the case may be, and hold them as security for the replacement to it within six months of the advances made by it to take them up; and, if such advances be not paid within six months, then the party of the second part may enforce the collection thereof, the same as any original or other holder of said bonds or renewals could do upon default in payment thereof at maturity.

"Article Sixth. The party of the first part covenants and agrees that the party of the second part shall have quiet and uninterrupted use and exclusive enjoyment of said extension until December 1st, A. D. 1978, and shall enjoy peaceably and without interference all the powers, rights, and privileges of the party of the first part, so far as the same may be needful to maintain and operate said extension in the manner aforesaid, including the right to impose and collect tolls and rates for transportation of freight and passengers, as fully and effectually as the party of the first part could do if operating said extension; and the party of the second part agrees that if, at any time, it becomes necessary to pay any money to perfect the title of the party of the first part to any property taken under this contract, or to protect the party of

the second part in its possession and use thereof, and the party of the first part has not the means to pay or adjust the same, then the party of the second part will advance the necessary sum or sums.

"In testimony whereof, the Terre Haute and Logansport Railroad Company and the Terre Haute and Indianapolis Railroad Company have caused these presents to be executed by their respective presidents, and their corporate seals to be hereunto affixed by their respective secretaries, the day and year first above written.

"Terre Haute and Logansport Railroad Company,
"[Seal.]                                                    By W. R. McKeen, President.
"Attest:   Geo. E. Farrington, Secretary.
"Terre Haute and Indianapolis Railroad Company,
"[Seal.]                                                    By W. R. McKeen, President.
"Attest:   Geo. E. Farrington, Secretary."

The trust deed and mortgage of January 1, 1883, for the foreclosure of which the bill was filed, conveyed the road from Rockville to Logansport, with everything incidental thereto, the proposed extension to South Bend, and all after-acquired property becoming part of said line or of its equipment, and was otherwise in the usual form of such alienations. Each of the bonds—as well those secured by the first trust deed as those secured by the second—was guarantied in due form by this appellant. The extension spoken of in the second operating agreement was, prior to November 24, 1884, duly made and completed. Appellant took the custody of the railroad property under the first operating agreement, and so held said property until the second operating agreement, and thereafter took the custody of the extension as the same was completed, and so held and operated the entire property, including the leased line from Rockville to Terre Haute, until November 13, 1896, when a receiver was appointed for that company by the circuit court of the United States for the district of Indiana; and said property has since been in the custody of the said court, pursuant to said receivership.

The answer filed by appellant, as well as its cross bill, showed that appellant had received as gross earnings of the road from Terre Haute to South Bend $8,550,159.04; that it had expended for operating purposes $7,593,793.36; that it had expended for taxes on the property, in payment of interest on the bonds of the two series, and for rent on the short line from Rockville to Terre Haute, a total of $1,752,462.86; and that from time to time during the period commencing with its custody of the road under the first operating agreement, and ending with the receivership, it had expended in betterments, apparently on that part of the line between Rockville and South Bend, and in operating equipment, $781,979.59. A portion of the equipment added to the property by appellant in 1892 was 100 box cars, upon which it is said Blair & Co., the manufacturers, still have some claim for a balance yet unpaid, in the form of promissory notes made by appellant, and held by said Blair & Co. The answer and cross bill showed further that up to October 31, 1882, appellant had received as gross earnings of the road $744,010.94; that the amount expended up to the date last mentioned for betterments and operating expenses was $955,140.99; that, of the sum last named, $59,388.80 was for betterments; that the amount expended up to the last-named date for rent of the line from Rockville to Terre Haute, for interest on the mortgage, and for taxes, was $136,622.30; that the total gross earnings up to October 31, 1883, was $1,087,923.19; that the total expended up to the date last mentioned for betterments and operating expenses was $1,331,783.23; that the total expended for rent, interest, and taxes up to the same date was $215,974.34; and that, assuming the contracts to be valid, there was on October 31, 1896, a large balance due from the Terre Haute & Logansport Railroad Company to appellant, of which, as computed by appellant, $443,994.57 was for improvements, betterments, and additions to said property; "and, to that extent, defendant [appellant] says that diversions were made from gross earnings to pay taxes, interest, and rentals during the period" from December 1, 1879, to October 31, 1896. The theory favored in appellant's pleading is that its guaranties on the bonds and both the operating agreements were ultra vires and void. In either case,—that is, whether these guaranties and agreements be held void or valid,—appellant asserted a large balance as due

to it on an accounting with the Terre Haute & Logansport Railroad Company, and claimed a lien for such balance prior to appellee Harrison's extension mortgage, or that appellee Harrison, representing the extension bondholders, ought, in equity, to pay said balance, as a condition precedent to foreclosure.

John G. Williams, Lawrence Maxwell, Jr., and S. O. Pickens, for appellant.

W. H. H. Miller and John B. Elam, for appellee.

Before JENKINS and SHOWALTER, Circuit Judges, and SEA MAN, District Judge.

SHOWALTER, Circuit Judge, after making the foregoing state ment, delivered the opinion of the court.

When the second operating agreement is read in connection with the first, and with the guaranty engagement indorsed by appellant on each of the bonds of both issues, it becomes obvious—assuming the validity of both agreements—that no interest or estate vested in appellant which can be deemed prior to the extension mortgage. Appellant became bound for the payment of each bond of each series by its special contract indorsed thereon. That provision of the first agreement wherein the Terre Haute & Logansport Railroad Company engaged that it would not further mortgage the property is annulled by the second agreement. The debt secured by the extension mortgage is not only the debt of appellant by its contract with each bondholder, but appellant stipulated with the Terre Haute & Logansport Railroad Company, in the second agreement, that it would pay both the coupons and the bonds. Keeping its engagements as expressly made in the second agreement, no interest vested by either writing in appellant could have interfered with the lien of the extension mortgage. The sense of the second writing plainly is, in effect, that, as against any interest in appellant by force of either writing, the Terre Haute & Logansport Railroad Company had the right to make the extension mortgage a prior lien. This engagement, as between appellant and the Terre Haute & Logansport Railroad Company, would be available to Harrison, trustee, in foreclosing the extension mortgage, on the principle of equitable subrogation. Whatever the Terre Haute & Logansport Railroad Company could insist on in favor of the extension mortgage by its contract with appellant would be available to Harrison, trustee, in a foreclosure by him of that mortgage. Plainly, appellant could not—assuming the writings to be valid—resist the foreclosure, or claim priority over the extension mortgage as to any property otherwise subject to the same.

But it is now said that the guaranty agreements on the bonds and the two operating agreements are ultra vires and void, and that the court must look to the status, as thus denuded of all such enforceable special contract engagements, to determine the rights of the parties. Appellant cites the maxim that he who seeks equity shall do equity. That rule, as applied in strictness, meets the case of a defendant against whom action is sought on the chancery side, and who, by reason of his status as defendant, is enabled, as against complainant, to claim some advantage or benefit which on his own bill in a direct proceeding would not have been available. For instance, what is called

"the wife's equity to a settlement" was enforced as against a husband, or his creditors, who found it necessary to go into chancery to reach or reduce to possession her property. But here the insistence is that appellant's money has gone into the mortgaged property; that, in so putting it there, appellant was not a volunteer, nor a donor, nor a wrongdoer; and that neither the Terre Haute & Logansport Railroad Company, nor its grantee, Harrison, trustee, ought to hold the property without refunding to appellant at least the value added thereto by improvements made with appellant's money. We do not clearly see that the claim is separable from that class wherein a court of chancery is asked to declare an equitable lien or to construct a trust in the interest of one whose property is traceable, without his fault, and under circumstances where a gift could not have been intended, into, and has become an indistinguishable part of, a larger property belonging to another. Is there here a subject-matter for the application, as against appellee Harrison and the bondholders, of that remedial fiction known on the chancery side as an "equitable lien" or a "constructive trust"? Or, as counsel for appellant would probably state the case, is the position of appellee Harrison, as representing the bondholders, such that a decree of foreclosure ought not to have gone in his favor without exacting from him payment to appellant to the extent of whatever value had been added to the property by such betterments and equipment as were provided by appellant?

In reasoning about the case, we think a distinction may be made between betterments and equipment added by appellant to the railroad property prior to the extension mortgage, and such as were added subsequent to the execution of that instrument. The money advanced by the bondholders or mortgagees under the extension mortgage was at once expended, either by or at the instance of appellant, in building the extension of the road from Logansport to South Bend, and in improving that portion of the road from Rockville to Logansport. Appellant forthwith took, if not the $1,000,000 itself, at least the property into which that money was converted, and retained and used the same, and appropriated the earnings thereof until the default which entitled appellee Harrison to enter by the terms of the extension mortgage; that is, for 12 years. Since appellant in fact made for its own benefit this use of the money of the mortgagees, or of what was bought with that money, it ought not to retake the special property, or any part thereof, which formed the consideration to the mortgagees for such advancement, without returning the money, or the appropriate portion thereof. In other words, the status of the case, as it remains when the operating contracts are deemed void, shows no equity in appellant, so far as concerns the betterments added prior to the extension mortgage, or prior to July, 1883, to prevent the foreclosure. If the first operating agreement is to be deemed void, then the custody by appellant at the time of the execution of the extension mortgage must be referred to an actual, legal possession then vested in the Terre Haute & Logansport Railroad Company. Assuming that appellant, while having the custody of the road, from 1879 to 1883, had spent, not some portion of the $500,000 borrowed under the mortgage of 1879, nor a portion of the moneys yielded as earnings by the road itself, but

its own money, in adding to the road betterments and equipment, still, within the actual intent of both companies, such betterments and equipment were merely part of a single property, and the Terre Haute & Logansport Railroad Company, being in possession and having title to that property, alienated the same to Harrison, trustee, by the extension mortgage.  Let it be supposed that appellee Harrison and the bondholders, when they took the extension bonds, had notice of such facts as would have been a sufficient basis for the declaration or construction by a court of chancery of a trust on the entire property to repay to appellant the money expended by it in added betterments and equipment, then possibly such trust might have been declared, if the $1,000,000 paid by the bondholders had gone to and been used by the Terre Haute & Logansport Railroad Company for purposes of its own, and with which appellant was not, and never became, concerned. But the fact remains, as said, that the money paid by the bondholders was spent at the instance of, if not directly by, appellant itself, in building the extension to South Bend, and in improvements on that part of the road between Rockville and Logansport, and all this property into which the $1,000,000 was converted went immediately into the custody of appellant, and appellant used the same, and took the earnings thereof, besides the incidental benefit to its road from Indianapolis to the state line, for many years, and until the right of entry vested in appellee Harrison for default in the conditions of the mortgage.  To now construct a trust or lien whereby appellant must be paid out of the property the amount invested by it in betterments and equipment prior to 1883 would really mean that appellant, after enjoying for 13 years the benefit of the money advanced by the bondholders, could also retake the consideration for which that advance was made.  The bondholders, in fact, and within the intent of all concerned, parted with their money for a mortgagee's interest in the railroad property with all betterments and equipment as extant in January, 1883.  There can be no equity whereby appellant may take back a portion of the property free from the lien paid for by the bondholders with money which appellant has in effect since used for its own benefit.

Suppose the appellant, being still solvent, had chosen in 1896 to disregard the operating contracts, as ultra vires and void, and had abandoned the Terre Haute & Logansport Road, and that appellee Harrison had thereupon proceeded to foreclose the extension mortgage; could appellant, as against the foreclosure, have been entitled to a lien superior to the mortgage for the cost of betterments and equipment put in the property prior to 1883, after using for its own profit for a dozen years the additional betterments and improvements into which the $1,000,000 paid by the bondholders was converted? Could a portion of that interest in the property for which the $1,000,000 was advanced be taken from the bondholders, and given to one who in fact converted the $1,000,000 so paid into betterments and improvements, and had had for so many years the exclusive use of that property, and then voluntarily abandoned the same?  What we now speak of is the status as concerns the betterments put into the property prior to January 1, 1883.  Betterments added subsequent to the extension mortgage will be considered later in this opinion.  The fact that the ap-

pellant advanced the money with which the Terre Haute & Logansport Railroad Company for so long a period paid the coupons on the extension mortgage is only material upon the point now under discussion, as having served to prevent a foreclosure, and prolong appellant's use and control of the mortgaged property. Appellee Harrison has, as concerns betterments and improvements made prior to 1883, not only the better equity, arising out of the status as denuded of valid operating contracts, but, since condition broken, and by the terms of the extension mortgage, he would seem to have the right of entry or possession,—in other words, the legal title.

As betterments and equipments were added to the railway property after July, 1883, they became subject to the mortgage, and title thereto vested in the Terre Haute & Logansport Railway Company. Appellant had notice, in adding such betterments and equipment, that the mortgage would cover the same. A contract charging after-acquired property becomes, in equity, a lien from the time such property is acquired, as against volunteers and persons having notice. 3 Pom. Eq. Jur. § 1236; also, sections 1235 and 1234. Betterments and equipment added after January, 1883, came within the mortgage lien by an agreement for which value had been already paid. A lien or charge actually extant in favor of a vendor or third person when the Terre Haute & Logansport Company took proprietorship over a given property then added to its road could not, of course, be divested or made subject to the mortgage. But an equitable lien or a constructive trust, such as is proposed in favor of appellant, is a remedial measure. It attaches on a title initially clear and exclusive in the party who is to be declared a trustee. If the Terre Haute & Logansport Railroad Company could not, as against appellee Harrison and the bondholders represented by him, have voluntarily declared itself a trustee of the railroad property to the extent of betterments and equipment added by appellant, then a court of chancery cannot make that company such a trustee. This, in effect, was the ruling in Thompson v. Railroad Co., 132 U. S. 68, 10 Sup. Ct. 29. In that case the additional seven miles of road had vested in the lessor company, free from any claim or lien to secure the contractor's certificates, as between the holders of those certificates and the bondholders. The mortgage made by the lessor company (apparently as a volunteer and without consideration) and the lessee company upon the seven miles of road to secure the contractor's certificates, and the resolution of the former company "to give effect to the [lessee company's] agreement for the lien on the earnings" to secure the payment of the contractor's certificates, and the subsequent engagement of the lessor company, on cancellation of the lease and assumption by that company of the custody of the road, to either pay the contractor's certificates, or surrender that portion of the road back to the lessee company, were so many attempts to do what the lessor company could not do, namely, make the contractor's certificates a lien on the after-acquired property prior to the original mortgage. As the seven miles of road was constructed, and became a part of the main line, the title thereto passed to the lessor company; and, being after-acquired property, said extension became subject to the original mortgage. The lessor company could not itself declare a

trust on that part of the road, or the earnings thereof, which would take priority over the original mortgage. Nor could a court of equity convert the lessor company into a trustee; that is, construct a lien or trust which would have such priority. Having notice of the prior mortgage, the contractors built the addition or extension. They did not—and this, possibly, they might have done—reserve any lien in their favor as a condition upon which they parted with their labor and material; but, being simply creditors of the lessee company, the lessor company attempted to fix in their favor a lien which should be prior to another lien long before contracted by the lessor company for value to the bondholders.

The proposition to charge the railroad property itself with the cost or present worth of improvements and equipment furnished by appellant during its custody of the road is doubtful on other grounds. For aught that appears, the money used by appellant in paying for such improvements and equipment may have been yielded by the road itself. Can a trust be fixed on the property, unless appellant's own money, as distinguished from the earnings of the road, be traceable into the same? If appellant's own money were used in providing the improvements and equipment added, for instance, prior to 1883, did appellee Harrison have notice of that fact when he took the extension mortgage? The cross bill and answer showed that he knew of the custody and use of the road by appellant, but this does not mean that he knew the state of the disbursements by appellant, and the special source from which the particular money used in paying for improvements and equipment, and which might thus be identified as present in the same, had been taken. Counsel for appellant state the proposition for which they contend in the following words:

"Appellant's right to compensation is measured by the enhancement in value of the Terre Haute & Logansport property caused by the improvements and additions made upon or to it by appellant,—not exceeding, however, the outlay of appellant on account thereof,—and for the amount thus ascertained equity gives appellant a first lien upon the property; for both contracts were made in good faith, and the improvements and additions to the property were made in good faith, whilst appellant was in possession under a contract which both parties believed to be valid."

They also quote from section 1241 of volume 3 of the second edition of Pomeroy's Equity Jurisprudence:

"Where a party lawfully in possession under a defective title makes permanent improvements, if relief is asked in equity by the true owner he will be compelled to allow for such improvements."

But suppose the party, having custody or enjoyment of the property for some purpose of his own by a contract with the general owner, who himself remains legally vested with possession, adds betterments which become part of the property, and suppose the general owner then, at the instance of said party, mortgages the property, and the money paid by the mortgagee is thereupon expended for further betterments, and the party first mentioned takes for a series of years the exclusive use and benefit of the improvements so paid for, and then, it being considered that his contract with the general owner was void, as beyond the power of either, abandons the property; shall he go

with the profits or benefits derived from the money of the mortgagee, and take with him a portion of what the mortgagee received in return for the money advanced? Shall the mortgagee, after entry for condition broken, be declared a trustee for the benefit of such party? Is the mortgagee in such case a purchaser for value and with notice of facts out of which a trust can be constructed as against him and in favor of such party?

Appellant has advanced money wherewith debts of the Terre Haute & Logansport Railroad Company, in the form of taxes, rent, and interest, have been paid. The rents were obligations for the use of the short line from Rockville to Terre Haute,—a piece of road apparently or possibly (as to the leasehold estate) not comprehended in the extension mortgage. The interest was part of the coupon indebtedness secured by the mortgage here in question and the prior mortgage. These coupons were extinguished by the payment, and with them, and as far as they were concerned, the mortgage lien securing their payment. The debt for taxes, and whatever lien could have been asserted in that behalf, were also extinguished. The Terre Haute & Logansport Railroad Company was bound to the mortgagee to pay the taxes and interest. But counsel for appellant rest their case upon the proposition before quoted from their argument. They contend for an equitable lien in favor of appellant for the value added to the property by the improvements and equipment provided by appellant. To this extent they would have appellee Harrison converted into a trustee for the benefit of appellant, as having a claim superior in equity to that of the bondholders. The theory that there has been a diversion—to the payment of interest—of income which ought to have been devoted to operating expenses does not seem to be insisted on. But the doctrine of Fosdick v. Schall, 99 U. S. 235, as further expounded by the chief justice in Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 11 Sup. Ct. 61, is plainly excluded from the present case. Nothing has been said in the argument as distinguishing the 100 box cars made by Blair & Co., and put into the equipment of the road in 1892 from other equipment and improvements added while appellant was in custody of the property. It is, of course, for Blair & Co. to themselves assert any right remaining in them as against any portion of the mortgaged property. The decree is affirmed.